RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
ALEXANDRIA, LOUISIANA
DATE 9/28/11
BY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| **VERDELL RANKIN** | **CIVIL ACTION NO. 08-1860** |
| -vs- | **JUDGE DRELL** |
| **CORRECTIONS CORPORATION OF AMERICA, et al.** | **MAGISTRATE JUDGE KIRK** |

### REASONS FOR JUDGMENT

Plaintiff, Verdell Rankin, filed this suit seeking compensation for damages he allegedly sustained on September 1, 2008 when he fought with fellow inmates Elverdis Breedlove and Derrick Edwards while all three men were incarcerated at Winn Correctional Center. More specifically, Mr. Rankin contends Defendants acted with deliberate indifference in failing to protect him from violence at the hands of other inmates. He seeks compensatory damages for head injuries, scarring, and emotional distress. He also prays for punitive damages.

After pretrial motions and other dispositions, Plaintiff proceeded to trial on his claims against Timothy Wilkinson, Warden; Virgil Lucas, Chief of Security; Cheryl Wiley, Ash Unit Manager; and Carl Coleman, Cypress Unit Manager. At the close of Plaintiff's case, the Court granted the Motion for Judgment on Partial Findings under Fed. R. Civ. P. 52 put forth by Cheryl Wiley and Carl Coleman, thus dismissing all remaining claims against those defendants with prejudice. (Document No. 92.)

The matter has now been fully tried, and all appropriate post-trial submissions have been made. Considering the evidence and argument presented, and for the reasons set forth below, this Court will render judgment in favor of Defendants, Timothy Wilkinson and Virgil Lucas, and will dismiss Plaintiff's claims with prejudice.

## I. ISSUES AND FINDINGS OF FACT

Verdell Rankin was incarcerated at Winn Correctional Center ("WCC") from June 11, 2007 through August 24, 2009. In August 2008, he was assigned to bunk number 17 in the Ash Unit, on the D1 tier. Bunk number 18, immediately next to Plaintiff's bunk, was allotted to Inmate Elverdis Breedlove.[1]

At some point near the middle of August 2008, Mr. Rankin found a coded note on his bunk that he thought had been written by Mr. Breedlove. Although Mr. Rankin did not know what the note said, he assumed it was a proposition to engage in homosexual activity. Because of the coded letter, Mr. Rankin asked former defendant Cheryl Wiley, the Ash Unit manager, to transfer Mr. Breedlove back to bunk number 14, which was approximately three beds away, but Mr. Breedlove was not moved.

Mr. Breedlove denied writing the note and, instead, contended Plaintiff sought sexual favors from him. When Mr. Breedlove allowed some of this activity, Mr. Rankin became overly aggressive, such that Mr. Breedlove requested the relationship not continue at its prior pace. There is additional evidence that on at least one occasion, Mr. Breedlove engaged in a homosexual relationship with Inmate Derrick Edwards, who was housed in the Ash Unit, on the A2 tier.

---

[1] Mr. Breedlove had previously been assigned to bunk number 14, but he had been moved during the month of August 2008.

2

On September 1, 2008, WCC was on "lockdown" in anticipation of Hurricane Gustav. Under those circumstances, the inmates were supposed to remain in their assigned tiers. However, at some point that day, Mr. Edwards left his tier (A2) and came to the bars of the D1 tier, where Plaintiff and Mr. Breedlove were housed.

Although the details are in conflict, there is evidence that Plaintiff and Mr. Edwards exchanged words and perhaps had contact with one another near the bars. Also, Plaintiff threw something, either water or toothpaste, into Mr. Edwards's face.

Mr. Breedlove then struck Plaintiff on the head and the two of them fought. There is conflicting testimony about whether the fight stopped and then began again. The evidence is also unclear regarding whether a weapon of some kind was involved and whether Mr. Breedlove or Plaintiff landed the first blow. Eventually, one or more inmates broke up the fight or fights between Plaintiff and Mr. Breedlove.

There is likewise a dispute as to why the D1 tier door was opened. The parties do not contest, however, that the door was opened for some reason, and that Mr. Edwards entered the D1 tier and began fighting with Plaintiff. The evidence is in conflict as to whether a sharp instrument was used by Mr. Edwards during this altercation.

The struggle between Plaintiff and Mr. Edwards was stopped either by WCC employees or by another inmate. Thereafter, Mr. Breedlove, Mr. Edwards, and Mr. Rankin were all handcuffed and removed from the D1 tier. Mr. Rankin was taken to the infirmary, where he was treated for the cuts to his head.

After the fights, all three involved inmates were transferred to cell blocks in the Cypress Unit as a disciplinary measure. On October 26, 2008, after Mr. Rankin had been

released from the cell blocks and returned to the Ash Unit, D1 tier, he was given a disciplinary write-up because a shank was located under his footlocker, and he was returned to a cell block in the Cypress Unit. According to Mr. Rankin, the next day, defendants Timothy Wilkinson and Virgil Lucas and former defendant Carl Coleman met with him. During that meeting, Warden Wilkinson asked Mr. Rankin to "put on paper" that he did not have any problems with Inmate Edwards. Mr. Rankin assumed the purpose of this was to allow Mr. Edwards to be returned to the general population. Mr. Rankin testified he told Warden Wilkinson that he did not have any problems with Mr. Edwards, but that he did not consent to the removal of Mr. Edwards from the cell blocks. On that same day, Plaintiff and Mr. Edwards were returned to the general population. Mr. Breedlove had gone back to the general population at some previous time. There is no evidence these three inmates were involved in any other confrontations even after they were all returned to WCC's general population.

## II. APPLICABLE LAW AND ANALYSIS

We first note that post-trial briefing was encouraged in this case, in part, to address any "spoliation" issue that might exist because the photographs and video taken by the WCC staff following the incident, along with any accompanying documentation, could not be located. As the jurisprudence explains,

> [S]poliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. The spoliation of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction. However, the determination of a proper sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is determined on a case by case basis.

4

Consolidated Aluminum Corp. v. Alcoa, Inc., 244 F.R.D. 335, 339 (M.D. La. 2006) (internal quotations and citations omitted). In order for an adverse inference sanction to be imposed, it must be shown that relevant evidence was destroyed in "bad faith" or by "bad conduct." Condrey v. SunTrust Bank of Georgia, 431 F.3d 191 (5th Cir.2005). The adverse inference is an "extreme" sanction that should "not be given lightly." Consolidated Aluminum, 244 F.R.D. at 340.

Since there was no evidence presented in the instant case that the photos, video, or documentation were unavailable as a result of bad faith by Defendants, no spoliation sanction or inference should be, or will be, imposed.

Turning to the substantive law applying to failure to protect claims, the treatment a prisoner receives and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. Cantu v. Jones, 293 F.3d 839, 844 (5th Cir. 2002) [citing Farmer v. Brennan, 511 U.S. 825, 832, (1994)]. In particular, the Eighth Amendment imposes on prison officials a duty to protect prisoners from violence at the hands of other inmates. Prison officials are not, however, expected to prevent all inmate-on-inmate violence. Farmer, 511 U.S. at 834. Prison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm.

A prison official is deliberately indifferent if he knows of an excessive risk to inmate health or safety and disregards that risk. The official is held to know of an excessive risk only if (1) he is aware of facts from which he could infer that a substantial

5

risk of serious harm exists and (2) he in fact draws the inference. In other words, in order to be deliberately indifferent, a prison official must be subjectively aware of the risk. See Farmer, 511 U.S. at 839-40.

In order to prove that an official is subjectively aware of a risk to inmate health or safety, a plaintiff inmate need not produce direct evidence of the official's knowledge. Rather, the plaintiff can rely on circumstantial evidence indicating that the official must have known about the risk. See Hope v. Pelzer, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."); Farmer, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]").

For example, the plaintiff can produce circumstantial evidence that the risk to inmate health or safety was so longstanding and pervasive that the official must have been aware of this danger. See Farmer, 511 U.S. at 842-43. See also Adames v. Perez, 331 F.3d 508, 512 (5th Cir. 2003).

The deliberate indifference standard is "an extremely high standard to meet." Domino v. Tex. Dep't. of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). It will not be found applicable if an official should have inferred a risk was posed to an inmate. Instead, it will only apply if the official actually did draw the inference. Adames, 331 F.3d at 514.

§ 1983 supervisory liability, which attempts to impose liability on the supervisor for wrongful acts of a subordinate, may not be based on a respondeat superior theory.

6

Rather, it may only be grounded on the supervisor's own wrongful acts or omissions. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, n. 58 (1978). Supervisors may be liable for constitutional violations committed by subordinate employees when supervisors act, or fail to act, with deliberate indifference (using the same definition of deliberate indifference outlined above) to violations of others' constitutional rights committed by their subordinates. Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 254 (5th Cir. 2005). Supervisory liability requires a showing of deliberately indifferent training or supervision causally linked to a violation of plaintiff's rights. Roberts v. City of Shreveport, 397 F.3d 287, 292 (5th Cir. 2005).

In this case, there is no evidence Mr. Rankin felt threatened by either Mr. Breedlove or Mr. Edwards or had been involved in any altercations with them prior to September 1, 2008. Rather, Plaintiff was merely annoyed enough by the coded note that he requested Mr. Breedlove be moved a few bunks away from him.

While the lockdown policy of WCC at the time of the incident arguably should have prevented Mr. Edwards from leaving his tier and entering Plaintiff's tier, there is no evidence Mr. Wilkinson or Mr. Lucas drew an inference that allowing these three inmates to be together would bring harm to Plaintiff. No "longstanding" or "pervasive" problem among these inmates has been shown, such that the requisite knowledge element essential to a deliberate indifference claim could be established. See Adames, 331 F.3d at 512.[2]

---

[2] Any evidence regarding discussions Mr. Wilkinson and/or Mr. Lucas had with Plaintiff more than one month after the incident does not establish what these defendants should have known or did know on September 1, 2008, when the fights occurred.

7

For these reasons, we find the evidence adduced at trial does not support a finding either that Defendants were aware of facts from which they could infer a substantial risk of serious harm existed, or that they actually drew such an inference. Thus, the deliberate indifference element has not been met, and no liability may be imposed upon these Defendants.

Accordingly, Plaintiff's claims against Virgil Lucas and Timothy Wilkinson will be DISMISSED WITH PREJUDICE.

SIGNED on this 28th day of September, 2011 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE